[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14213
_____

D.C. Docket No. 3:10-cv-00350-MEF-TFM

CLAUDE R. SHORT,

Plaintiff-Appellant,

versus

MANDO AMERICAN CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(February 27, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and JORDAN, Circuit Judges.

PER CURIAM:

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000 et seq., 42 U.S.C. § 1981 (§ 1981), and state tort law. It began on April 22, 2010, when Claude Short filed a seven-count complaint against his former employer, Mando American Corporation. On September 6, 2011, the District Court entered a final judgment pursuant to a jury verdict on one of Short's § 1981 claims and summary judgment on the remaining claims. Short appeals the judgment based on the jury verdict, arguing that trial errors warrant a new trial. He appeals the summary judgment to the extent that it decided his Title VII and § 1981 claims of racial discrimination, national origin discrimination, and retaliation. According to Short, Mando demoted him and eventually discharged him on account of his race (white) and his national origin (American), and because he exercised his Title VII and § 1981 rights to oppose Mando's employment policies as discriminatory.

I.

Mando manufactures, assembles, and sells automotive parts. Its main customers are the Big Three automakers — General Motors, Chrysler, and Ford — with General Motors being its largest customer. Mando's headquarters and manufacturing plant are located in Opelika, Alabama. The company's customer-

support center is located in the Detroit suburb of Plymouth, Michigan, near the main offices of the Big Three.

In August 2006, Mando hired Short, a white male born and raised in the United States, as "Quality Director"[1] of its Opelika plant.  Short joined Mando after retiring from his job as a quality specialist at General Motors.  Mando paid Short an annual salary of $130,000 to direct the operations of Mando's Quality Department.  The department was responsible for (1) addressing supplier quality, which meant communicating with suppliers to resolve problems with component parts and to seek refunds from suppliers when necessary; (2) addressing problems in production; (3) addressing problems with customers after Mando delivered its products; and (4) maintaining the accurate and complete data necessary to support the first three tasks.  From 2004 until Short's hire in August 2006, Nosuk Ha, a Korean citizen of Korean origin, led the Quality Department.  Ha stayed in the Quality Department for two months after Short took over to help transition Short into the position.  By October 2006, Short had transitioned fully into his role, and Ha moved on to his new position as General Manager of Production Engineering (a role outside the Quality Department).

---

[1] We use "Quality Director" and "Director of Quality" interchangeably to describe Short's initial role at Mando.

3

By July 2007, Mando's president, Tae Young Kwak,[2] concluded that Short was not equal to the task of running the Quality Department. Kwak thought that under Short's leadership the Quality Department's communication with suppliers had deteriorated and that the department was failing to keep complete and reliable quality data. This in turn was affecting Mando's ability to collect "chargebacks" from its suppliers for expenses incurred when component parts did not conform to purchase specifications. Mando's suppliers were not accepting chargebacks from the Quality Department because they did not think they were receiving adequate and accurate information from Mando to justify the chargebacks. For example, some suppliers would receive duplicate requests for chargebacks or requests for chargebacks for components they had not supplied.

By the summer of 2007, there were hundreds of thousands of dollars of outstanding chargebacks that Mando's suppliers refused to accept. In an attempt to resolve the problem, Kwak removed the "supplier quality" function from the Quality Department and placed it in the Purchasing Department, which was headed by Kibong Kim. Kwak thought Kim's involvement would improve communication between Mando and its suppliers and thus encourage the suppliers to accept responsibility for the chargebacks. Short continued to have the

---

[2] Kwak joined Mando in September 2006 and became its president in January 2007.

4

responsibility of identifying nonconforming parts Mando received from suppliers, of gathering the quality data Mando needed to initiate the chargebacks, and of preparing the "debit memoranda" needed to support and justify the chargebacks. Despite Kim's involvement, Mando's suppliers were still reluctant to honor the chargebacks.

Between the summer of 2007 and late 2008, Kwak repeatedly complained to Short about the high number of outstanding chargebacks, but the problem persisted. By the fall of 2008, the United States was in recession, and the automotive industry was experiencing a severe economic downturn.[3] The chargebacks had increased to several million dollars, and suppliers were more resistant than ever to provide Mando refunds for noncompliant parts without complete and accurate quality data.

On December 15, 2008, Kwak removed Short from his position as Director of Quality and placed him in a new role, as Director of Customer Service and

---

[3] Mando projected that its sales for 2009 would be one-sixth of the previous year's sales. On June 1, 2009, Mando's primary customer, General Motors, sought bankruptcy protection, filing a petition for Chapter 11 reorganization in the Bankruptcy Court for the Southern District of New York. Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.), 430 B.R. 65, 70 (S.D.N.Y. 2010). On July 10, 2009, a new entity completed the purchase of GM's continuing operations and assets as part of Chapter 11 reorganization. See id. at 76–77.

Warranty.[4]  Short would work out of Mando's office in Plymouth, Michigan, close

to the headquarters of the Big Three customers.  Short was willing to take on the

new position, but wanted to work from his lakeside vacation home in Tennessee

instead of moving to Michigan.  Kwak had misgivings, because he was convinced

that Short should have his office close to the Big Three's headquarters, but he

relented and gave Short permission to work remotely.  In January 2009, Short left

Opelika, Alabama, where he had been living, and moved to his Tennessee vacation

home.

According to Short, Kwak's explanation for the change — Short's removal

from the Director of Quality position and later assignment to the Director of

Customer Service and Warranty role — was that Mando wanted a Korean to head

the Quality Department.  According to Kwak, by contrast, the change was

necessary because the company was not happy with Short's handling of the

chargeback problem.

Kwak first offered the open Quality Director position to Jerry Rolison, who

was in charge of Mando's Human Resources Department, but Rolison declined.

Kwak then turned to Ha, who accepted the position, and on January 1, 2009, Ha

became the head of the Quality Department.  Ha's title changed to "Quality

---

[4] As Director of Customer Service and Warranty, Short would start at the annual salary he had been receiving ($130,000), but effective March 1, 2009, when all of Mando's managers would be receiving a pay cut, his salary would be reduced to $96,000.

6

Control/Production Engineering General Manager," because he became responsible for supplier quality, production quality, and customer service for Mando's non-Big Three customers, mainly Hyundai and Kia, while continuing in his role as General Manager of Production Engineering.

By June 2009, Kwak had second thoughts about Short working from Tennessee. As Kwak put it, Short was "out of the loop." Kwak believed Short could do a better job if he were close to the Big Three's headquarters and their plants in Toledo, Ohio, and Ontario, Canada. In addition, Mando could cut its expenses by terminating its contract with a third party who had been handling "drop shipments"[5] and assigning that task to Short.

On June 18, 2009, Ha, speaking for Kwak, informed Short that he was being transferred to Plymouth, Michigan, at the same salary and fringe benefits he had been receiving. Ha told Short that in addition to servicing the Big Three customers as Director of Customer Service and Warranty, he would be taking over the drop shipments function.

On June 19, Short sent Ha an email, with a copy to Kwak, and a blind copy to HR manager Rolison, questioning the transfer. In the email, Short stated that he

---

[5] "Drop shipments" refer to parts and assemblies that are shipped directly from Mando's suppliers to Mando's customers.

would have "no difficulty handling all aspects" of the new assignment but

expressed his concern that the transfer amounted to a demotion:

> I guess my question is as follows: "Why am I being demoted again?"
> I was informed that the reason for my demotion in January 2009 was
> because HQ wanted a Korean to be head of Quality.  During the week
> of December 15, 2008, I had a conversation with Mr. Kwak in which
> he informed me that HQ wanted a Korean in the top spot for Quality,
> in order to facilitate better communications with HQ.  He also stated
> that I would report to that Korean person.  At that time it was not
> disclosed to me who that person would be.  I did ask Mr. Kwak what
> my new title would be and he stated that my position would still be a
> director level job.
>
> . . . .
>
> I am sure you can recall the conversation that you and I had in
> January, during which we discussed the reasons for the changes in my
> job responsibilities.  At that time, I stated that this was not a
> performance issue, but that HQ wanted a Korean person to fill that top
> spot in the company's organization . . . .
>
> To sum it all up, I was demoted from a position as the Director of
> Quality ("top" Quality spot in the company) to handling all of
> Customer Service and Warranty issues for the "big three".
>
> Now, you tell me that I am being demoted again.  My question at this
> time is simply, "WHY"?

On June 24, Ha responded to Short via email, with copy to Rolison.  He

explained that the job change was due to "current business conditions" and "[was]

not associated [with] [Short's] performance."  Ha complimented Short, noting that

his "leadership and contributions have been very beneficial," but he stood firm on

8

Short's need to move to Michigan, explaining that "to be successful in this proposed role," Short would have to be in Plymouth because it would allow Short to "better service [Mando's] customers and suppliers more timely and economically" because "the bulk of these contact points and locations are regional to Plymouth." He reassured Short that Mando had "no plans to reduce [his] salary, . . . title or benefits" and that Mando was just changing his "job description" and "base location."

The next day, on June 25, Short emailed Ha in response, with a copy to Rolison, telling them that he would take Ha at his word that Plymouth was the best location for him. Short asked Ha for details about the move, including how soon it would occur, whether Mando would cover his living expenses in Michigan until his Tennessee home sold and he found a new home in Michigan, whether Mando would purchase his Tennessee home at fair market value if it did not sell, whether Mando would cover his real estate fees, whether Mando would handle listing his Tennessee home for sale, and whether Mando would relocate his furniture and belongings to Michigan. Short also "request[ed] a long-term [employment] agreement from Mando" but did not specify what it would provide.

On July 9, Rolison emailed Short the terms of his transfer, with a copy to Kwak and Ha. In the email, Rolison explained that Mando wanted Short to begin

9

working out of its Plymouth office within the next week or two and asked that the full relocation be completed no later than September 14th, assuring Short that "[d]uring the interim period, [Mando] will absorb the business expenses of any approved travel requirements to the Michigan area, or other related business travel associated with the position." Rolison informed Short that Mando's "standard relocation package is to provide a lump sum payment equal to 10% of [Short's] salary for miscellaneous moving expenses in addition to providing a moving company to relocate [his] household belongings." The lump sum payment was intended to help Short pay for real estate fees, closing costs, and utility fees. Rolison explained that Mando did not have a program for purchasing the homes of relocated employees; hence, Short would have the responsibility of "selecting and listing [his] home with a realtor." With respect to Short's request for a long-term employment agreement, he told Short that Mando had a policy of employment at will, and that only the president of the company "ha[d] the authority to enter into any agreement with any individual for employment for a specified period of time." Rolison asked Short to let the company know his decision by July 16, 2009, and stated that he "sincerely hope[d] that [Short] will accept this change and continue to help [Mando] be successful."

10

Six days later, on July 15, Short sent Rolison an email, with copy to Ha and Kwak, taking issue with the terms Rolison had set forth in his last email. Short explained that he could not afford to buy or rent another home in Michigan until he sold and closed on his Tennessee home and requested that Mando "be patient with [him] as [he] work[s] through this [relocation] process." Short took issue with the lump sum payment, noting that the Michigan move would be his "third relocation in less than three years" and that it would "cost more than the lump sum payment . . . to break even." Short pointed out that when he accepted the job as Quality Director, Mando moved his household belongings in addition to providing him with a lump sum payment of $20,000, which was more than ten percent of his salary. He lamented that he was "being asked to move at the risk of financial hardship" for a "lesser paying . . . less prestigious . . . position." Short then listed $43,950 worth of estimated real estate and closing costs he was going to incur and complained that the $5,760 that he would have in hand for relocation after taxes had been deducted would not cover the costs. He also brought up his previous move to Tennessee, asking the following: "If Mando's standard relocation package provides a lump sum payment equal to 10% of the employee's salary, might I safely assume that I should be receiving $13,000 for my relocation to Tennessee in January 2009?" Short concluded his email by stating that he was

11

willing to negotiate with Kwak on a long-term employment agreement and then requested a three-year employment agreement with standard benefits, a guarantee that his salary would not be reduced, a company vehicle of the same class and size as his current vehicle, assurance that he would get normal pay increases as the other salaried employees received them, and assurance that he would not have to move again.

On July 21, Rolison emailed Short, with copy to Kwak, explaining that "after careful consideration and review of [his] demands," Mando would not agree to the terms Short requested. Rolison then provided Short with two options and asked that Short let him know which option he chose:

> Option 1: Accept the new position based in the Plymouth office with the terms we presented; or
>
> Option 2: It may be in the best interests of both parties if we release you from [Mando's] employment effective Friday, July 31, 2009.
>
> Please get back to me within 24 hours with your final decision and I hope we can continue the working relationship . . . .
>
> We sincerely hope you select option 1; however, should you select option 2, it has been a pleasure knowing and working with you.

The next day, July 22, Short sent Rolison and Kwak an email, with copy to Ha, in which he explained that he had already "accepted" the position but continued to challenge and negotiate the terms. Short stated the following:

12

I thought it was understood that I had already accepted the position. . . . I thought I was very careful to follow the instructions in your email, dated 7/09/09 . . . . In item number 1 you told me that I was to be in Plymouth within the next 1-2 weeks with the target date for full relocation of September 14.  You also said that, during the interim period, [Mando] would absorb the business expenses of any approved travel expenses to the Michigan area; I sent travel requests to Nick and, so far, he has failed to approve them.  In summary, during the interim period between 7/9/09 and September 14 I was expecting that [Mando] would take care of the expenses as I left immediately for Michigan. . . . For this reason, I submitted 8 weeks of travel requests.  I have been awaiting approval to begin the process.

Secondly, I put my Tennessee home up for sale in order that I can relocate.  However, due to the $34,000 pay cut, I cannot afford another home or apartment until this one is sold.  So, yes, I am attempting to accept the position, but I feel that [Mando] is not living up to the conditions set forth in that email, or I would already be involved in the transition to the Plymouth, Michigan office.

In order to be perfectly clear, let me state that I am accepting option no. 1 of your email dated 7/21/09 . . . . the position in Plymouth, Michigan with the terms you have presented.  Option number 2 is not acceptable.

. . .

This will be my second move on behalf of [Mando] in one year.  As mentioned above, I cannot afford another home or apartment at this time; therefore, I was requesting additional relocation assistance to minimize my financial loss.  Also, I need some assurance that I will not sell my home in Tennessee and move to Michigan, only to be terminated and left in that location.  For this reason, I made the statement that I <u>need</u> a three-year contract of employment, not that I <u>demand</u> a contract.

. . .

13

> Regarding the last move [to Tennessee], I had a simple question: was I not entitled to the standard moving package of 10% of my salary to cover the expenses that I incurred during that move?

Also on July 22, Short prepared his first "Charge of Discrimination," which he filed with the Equal Employment Opportunity Commission (EEOC) on July 30, 2009.[6]

On July 30, Rolison sent Short an email in response to his July 22 email, with copy to Ha and Kwak, telling Short that Mando was "pleased that [Short had] accepted the position in Michigan" and requesting that Short "prepare to begin operating out of the Plymouth offices by August 13th" because the contractor, whose drop shipment duties Short was to take over, had already been released.

The next day, July 31, Short sent Rolison an email, with a copy to Ha and Kwak, in which he accused Mando of changing his start date and complained about the relocation terms.  He said this about the start date:

> In the e-mail dated 7/9/09 you stated that you wanted me in Plymouth in one to two weeks; you wanted me permanently relocated no later than September 14, and that you would absorb the business expenses of any approved travel requirements.  In the email I received yesterday you indicated that I am expected to be permanently relocated by August 13, and that you are expecting me to cover all

---

[6] In his first EEOC filing, Short alleged the following:  "It is my belief that the company is trying to force me to quit due to my age and my national origin as the company has expressed a preference for Korean persons to hold top positions within the company.  Further, I believe I am being retaliated against for voicing my complaints of discrimination."

14

expenses.  The e-mail yesterday is clearly not aligned with your earlier proposal dated July 9.

Short went on to say that he "[could] not afford to pay [for] rent, or buy a home until [his] Tennessee home sells and closes" and that he was "aware of other employees within Mando who have been expected to move, and the company has been much more patient with them due to similar domestic situations."  Without naming the "other employees," Short asked, "[w]hy am I not receiving equal consideration?"  In the last paragraph of his email, Short stated that he was "finding it difficult/frustrating to deal with the constant changing of [Mando's] expectations" and that he was "ready and willing to work in Michigan" but "need[ed] fair and consistent direction in order to make this transition."

After receiving Short's email, Kwak thought it was evident that Short was not agreeable to the relocation package and thus concluded that he was not willing to accept Mando's continued employment.  He instructed Rolison to advise Short that his employment with Mando had ended.  Rolison called Short on July 31, 2009, but Short did not answer the phone, so Rolison left a message, asking Short to call him back.  On August 3, when Short returned the call, Rolison informed him that his employment with Mando had been terminated.  Rolison followed the call with an email dated August 7.  The email reiterated that Short's employment had been terminated effective July 31, 2009, and noted that the parties were

15

"unsuccessful in reaching a mutually acceptable relocation package." Mando hired a white American male, Will Trent, as Director of Customer Service and Warranty, the position Short had occupied prior to his discharge. Mando hired a permanent employee, a white American male, Don Scott, to perform the drop shipment duties Short was to have assumed.

On August 5, 2009, Mando received written notification from the EEOC of the charge of discrimination that Short had filed on July 30. On August 19, 2009, Short filed a second EEOC charge.[7] After receiving right to sue notices from the EEOC, which were mailed on February 2, 2010, Short filed this lawsuit on April 22, 2010.

Short's complaint asserted seven counts, only three of which are relevant to this appeal. Under 42 U.S.C. § 1981 and Title VII, he raised claims of racial discrimination, national origin discrimination, and retaliation. In support of those claims, he alleged that he had suffered three adverse employment actions at Mando: (1) he was demoted from his position as Director of Quality Control in

_____

[7] In his second EEOC filing, Short alleged the following:

> My name is Claude Short and I filed a charge with the EEOC on July 30, 2009 . . . . It is attached as Exhibit "A." I am a white male and I am 62 years of age. I am American. My employer . . . told me they preferred Korean individuals working at my level of management within the company. I was fired within five (5) days of filing my prior [July 30] charge. The company gave no reason for terminating my employment . . . . It is my belief I was terminated in retaliation for my complaints and further as a result of unlawful discrimination and harassment.

16

December 2008; (2) he was demoted from his position as Director of Customer Service and Warranty and transferred to Michigan in June 2009; and (3) his employment was terminated in August 2009.

By the time the case was at the summary judgment stage, Short had abandoned most of his claims except for those alleging discrimination based on race and national origin, as well as retaliation. The district court separately considered each of the three alleged adverse employment actions. It granted summary judgment in favor of Mando on all of Short's remaining claims except for his § 1981 racial discrimination claim based on his alleged 2008 demotion, which went to trial.

The jury returned a verdict in favor of Mando, and the district court entered judgment on the verdict. Short has appealed the district court's grant of summary judgment on his discrimination and retaliation claims based on his June 2009 transfer to Michigan and his August 2009 termination. He also contends that an alleged Batson violation and some erroneous evidentiary rulings entitle him to a new trial on his § 1981 discriminatory demotion claim based on his 2008 demotion.[8]

---

[8] Specifically, Short contends that the district court (1) erred in overruling his objection, based on Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), and its progeny, to Mando's peremptory challenge of four black prospective jurors; (2) abused its discretion in granting Mando's motion in limine to preclude him from introducing evidence unrelated to his December

17

II.

To begin with, we find no merit in any of Short's arguments for a new trial

on the § 1981 discriminatory demotion claim and accordingly affirm the district

court's judgment as to that claim without further discussion.  We therefore move to

the district court's summary disposition of Short's claims that Mando (1)

discriminated against him based on race or national origin when it transferred[9] him

to Michigan in June 2009 (the discriminatory transfer claim); (2) discriminated

against him based on race or national origin when it terminated his employment in

August 2009 (the discriminatory termination claim); and (3) retaliated against him

when he complained about the company's allegedly discriminatory conduct (the

retaliation claims).  We review de novo the district court's grant of summary

_____

15, 2008, demotion as Director of Quality; (3) abused its discretion in permitting Mando to introduce into evidence two nondiscriminatory reasons (not identified in the pretrial order) for the demotion; (4) abused its discretion in permitting Mando to call as a witness Kim Gradic of Mando's Human Resources Department, because although Short listed Gradic as a witness, Mando did not; and (5) abused its discretion in limiting the testimony of a former Mando employee, Leanne Kidd, who had sued Mando claiming that it favored persons of Korean origin over white Americans in its employment decisions.

[9] We note that Short repeatedly characterizes the June 2009 transfer as a "demotion."  Mando disputes that it was a demotion and further contends that the transfer was not an adverse employment action.  For purposes of resolving this appeal, we need not decide whether the employment action taken by Mando was a demotion, a transfer, or both, because it does not change our analysis.  Instead, we will assume that the transfer amounted to a demotion, which is indisputably an adverse action.

18

judgment, applying the same standards as the district court. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).

Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Under that familiar McDonnell Douglas framework, if the plaintiff makes out a prima facie case,[10] the defendant must proffer a legitimate, nondiscriminatory reason for its actions. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." Id. "However, the defendant's response must frame the factual issue

---

[10] The district court assumed that Short made out prima facie cases for discriminatory transfer, discriminatory termination, and retaliation, and moved to the questions of whether Mando had proffered legitimate reasons for its actions and whether Short had shown the reasons to be pretextual. That is an acceptable analytical approach. See, e.g., Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (assuming a prima facie case and stating that "[i]t matters not whether [the plaintiff] has made out a prima facie case if she cannot create a genuine issue of material fact as to whether [her employer's] proffered reasons for firing her are pretext masking discrimination"). We note, however, that in addition to the lack of pretext evidence, we seriously doubt that Short has established a prima facie case for discriminatory or retaliatory conduct. Regarding the transfer and termination claims, Short has presented no evidence of a "similarly situated comparator," someone outside of his class who was treated more favorably under the same or similar circumstances. Regarding the retaliation claims, Short has shown no causal connection between the alleged protected activities and the adverse actions.

19

with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. (quotation marks omitted).

Regarding the discriminatory transfer claim, Mando's proffered legitimate reasons were that it took the action in order to cut costs (by having a salaried employee instead of a contractor handle the drop shipments) and to improve service to its customers, including the Big Three, which were located there. Instead of showing that the proffered reasons for the transfer were pretextual, Short quarrels with Mando's business judgment and with the company's purportedly subjective reasons for its decision, which he asserts are less deserving of credence. Those efforts to show pretext fail. See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."); id. at 1034 ("[S]ubjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions. Subjective reasons can be just as valid as objective reasons."). We similarly reject Short's contention that Mando's proffered reasons are not clearly articulated or are too

20

vague to give him a full and fair opportunity to demonstrate pretext.[11]  There is
nothing vague about Mando's claimed desire to cut costs[12] and provide better
service to the Big Three.

Short directs our attention back to Kwak's alleged comment about Mando's
headquarters wanting a Korean in the Quality Director position, which was made
when Short was removed from that position in December 2008.  Short asserts that
there is no reason to believe that Kwak's "bigotry" would have decreased six
months after he made that comment, so it should be considered evidence of pretext
in the June 2009 transfer decision.  While we agree that a stray remark by a
decision maker can be considered circumstantial evidence of discriminatory
animus, we nevertheless conclude that this particular remark was "isolated and
unrelated to the challenged employment decision" and therefore insufficient by
itself to establish a genuine fact issue on pretext.  Rojas v. Florida, 285 F.3d 1339,

---

[11] Short relies on Stamey v. Southern Bell Telephone & Telegraph Co., 859 F.2d 855, 861–62 (11th Cir. 1988).  In that case, we said that the employer offered "only vague 'business reasons' for the restructuring" in response to the plaintiff's evidence that all of the older people in management were being phased out.  Id. at 862.  The result in Stamey was that the defendant failed to rebut the plaintiff's prima facie case.  But Mando's reasons for its June 2009 decision are not vague, and Short's evidence of discrimination is virtually nonexistent.

[12] Short believes that his transfer would not have saved the company money on travel costs. He does not mention, however, the money that would have been saved by having him take over the drop shipment work from a contractor.  More to the point, Short's beliefs about what Mando would or would not have saved by moving him to Michigan are not relevant. What matters is what Kwak believed.  See Alvarez, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

21

1343 (11th Cir. 2002).   If anything, the remark "created only a weak issue of fact" as to whether Mando's proffered reasons were untrue, which as a matter of law cannot overcome "abundant and uncontroverted independent evidence that no discrimination had occurred."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000).  In sum, we agree with the district court that Short has failed to show that Mando's proffered reasons for Short's transfer to Michigan were a pretext for discrimination.

As for the discriminatory termination claim, Short contends that Mando did not provide a specific enough reason for his termination.  Instead, according to Short, the district court "rummage[d] through the record" and provided a reason on Mando's behalf.   To the extent that the district court rummaged, it certainly did not need to rummage very deep:  the record is clear that Short and Mando could not agree on the terms of the relocation package.   During the negotiation, Mando presented Short with two options:  he could accept the terms of the relocation as offered, or his employment with Mando was over.  Short said he wanted to accept the position, but he nonetheless persisted in trying to negotiate terms more favorable to him.  Rolison sent Short an email that said:  "While several attempts were made to express our interest in maintaining your employment in the

22

Plymouth, Michigan area, we were unsuccessful in reaching a mutually acceptable relocation package." Mando told Short that his employment was over.

The string of emails between Short and Ha (acting on behalf of Kwak) and Short and Rolison (also acting on behalf of Kwak) does not create an issue of fact. No reasonable juror could find that Short accepted the terms of the relocation offer. More to the point, no reasonable juror could find that Mando's proffered reason for Short's termination — that he had not accepted the terms of the relocation offer — was a pretext for discrimination.

Finally, Short also failed to show that Mando's reasons for transferring and terminating him were a pretext for retaliatory conduct. In response to Short's retaliatory transfer claim, Mando asserted that the decision was made to cut costs and provide better service to customers. Those proffered reasons were no more a pretext for retaliation against Short than they were pretext for discrimination against him.[13] In response to Short's retaliatory termination claim, Mando asserted

---

[13] We do not intend to state or imply that a reason that is not a pretext for discrimination cannot be a pretext for retaliation. Those inquiries must be addressed separately. That does not mean, however, that evidence in the record establishing that there was no genuine issue of material fact about pretext for discrimination cannot also serve as a basis for affirming the district court's judgment on the retaliation claims. We are reviewing the district court's grant of summary judgment de novo, which means that we "consider all the evidence in the record, and make all reasonable factual inferences, in the light most favorable to the non-moving party." Paylor v. Hartford Fire Ins. Co., 748 F.3d 1117, 1121 (11th Cir. 2014). Considering all the evidence in the record and making inferences in the required light, we are convinced that Short failed to show that Mando's reasons for transferring him and later terminating him were a pretext for unlawful retaliation.

23

that Short refused to accept the terms and conditions of his relocation to Michigan. Again, that proffered reason is no more pretext for retaliation against Short than it was for discrimination against him.

**AFFIRMED.**

24